# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**

**VERSUS**

**ANDRE ZENO**

**CRIMINAL**

**NO. 19-135-JWD-RLB**

## RULING AND ORDER

This matter comes before the Court on the *Defendant's Motion to Suppress* (Doc. 19) filed by Defendant Andre Zeno ("Defendant"). The United States of America (the "Government") opposes the motion. (Doc. 21.)  Following the April 8, 2021, evidentiary hearing (Doc. 35), both parties submitted post-hearing briefs (Docs. 39, 40, 41).  Further argument is not necessary.  The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.  For the following reasons, Defendant's motion is denied.

### I.      Relevant Factual Background

#### A.  Overview

This motion centers on the legality of a traffic stop. On May 6, 2018, Louisiana State Police ("LSP") Sergeant Joseph Nations was working along I-10 in West Baton Rouge Parish. Defendant was driving a black 2018 Chevrolet Silverado truck eastbound on I-10.  Around 4:46 p.m., Nations effectuated a traffic stop of the truck Defendant was driving. The facts surrounding the basis for the stop are disputed.

After the stop, Nations contacted LSP Master Trooper Jason St. Romain for back up. Upon St. Romain's arrival, Nations asked Defendant's permission to search his truck. Defendant declined. Thereafter, St. Romain and his K9 conducted an open-air sniff. The K9 alerted Nations

and St. Romain to the presence of illegal narcotics in Defendant's truck. Nations then searched Defendant's vehicle and found approximately 1.2 kilograms of cocaine.

Defendant was subsequently indicted by a federal grand jury on one count of possession with the intent to distribute cocaine in violation of 18 U.S.C. § 841(a)(1). (Doc. 1.)

As will be discussed below, the crux of this motion is whether Nations' initial stop of Defendant was justified. The details from the encounter come primarily from the testimony developed at the suppression hearing. In total, six witnesses took the stand and testified under oath: five law enforcement officers, including two DEA Task Force Officers and two Louisiana State Police troopers, and Defendant. The following sections are taken from this evidence and are a summary of the events leading up to Defendant's arrest.

### B.  The Tip

Around noon on May 6, 2018, Baton Rouge Police Department/DEA Task Force Officer Tommy Banks received a tip from a confidential informant regarding possible criminal activity.[1] (Doc. 38, Tr. at 10.) TFO Banks testified that the informant is a credible and reliable source of information based on his prior work with this informant. (Tr. at 9-10.)

Banks authored a written report that described the tip as follows:

```
3. The SOI informed TFO Banks that an unknown black male narcotics courier
(U/M) left Houston, Tx at 1:15 pm on May 6, 2018 and was travelling to
Baton Rouge, La on the same date to deliver 1.5 kilograms of cocaine that
was concealed in a black 2018 Chevrolet Silverado (C576461-LA). The SOI
provided TFO Banks with a license plate to the listed truck. The SOI
stated that he/she knew the driver of the listed truck as "Leory."
```

(Gov. Ex. 1.)

Banks relayed this information to LSP investigator Jack Toney, who is also a DEA Task Force Officer. (Tr. at 12, 21, 24.)  LSP Investigator Toney then called LSP Master Trooper Jason

---

[1] Banks works for the BRPD but is assigned to the DEA task force. (Tr. at 6-7, 15-16.)

St. Romain and relayed the tip to him. (Tr. at 26-27, 122.)  St. Romain in turn relayed the tip to

Sergeant Jason Nations. (Tr. at 51-52, 124.)

### C.  The Stop

Troopers Nations and St. Romain are part of Louisiana State Police Troop A's Interdiction

team. They received the tip on the afternoon of May 6, 2018. (Doc. 38, Tr. at 51-52, 122.)  At that

time, they were on criminal patrol together along interstate I-10 in West Baton Rouge Parish. (Tr.

at 56, 121-22.) Nations and St. Romain were patrolling the area in separate vehicles. (Tr. at 61,

121.) Nations nor St. Romain had a dash camera equipped in their vehicles because they had

recently been given new units that had not yet been equipped with dash cameras. (Tr. at 56, 82,

122.)

### 1. Nations' Testimony

Upon receiving the tip from St. Romain, Nations ran the license plate number in the License

Plate Reader ("LPR") system and was able to verify that the vehicle had traveled westbound that

morning and was returning eastbound from Texas that day. (Tr. at 54, 86.)

At around 4:46 p.m., Nations spotted the black 2018 Chevrolet Silverado truck with license

plate number # C576461. (Tr. at 53, 57-59.) Nations testified that he was sitting in his unit on the

shoulder of I-10 in the grass near mile marker 145 facing I-10 eastbound. (Tr. at 87.)  Upon seeing

the truck, Nations pulled off the shoulder of the interstate and into traffic. (Tr. at 59, 88-89.) While

driving behind Defendant, Nations said he "could tell [Defendant] was paying attention to what I

was doing, trying to see if I was going to stop him." (Tr. at 59.)

Nations then observed Defendant's vehicle commit a violation of La. R.S. 32:79 by

crossing over the fog line several times. (Tr. at 59, 60, 89, 90.) He activated his lights and initiated

a stop of the vehicle. (Tr. at 59, 61.) Nations explained that while the tip provided reasonable

3

suspicion to stop the vehicle, he developed his "own probable cause based off of [the] traffic violation." (Tr. at 90, 103.)

After the stop, Nations approached the vehicle, identified himself as an officer, and explained the reason for the stop. (Tr. at 64-65.)  According to Nations, Defendant appeared nervous. (Tr. at 65; Def. Ex. 1 at 3, describing Defendant as "very nervous.") He would not look Nations in the eyes and his bottom lip was shaking. (Tr. at 65.) Nations asked Defendant for his license, registration, and rental agreement. (Tr. at 65, 69.) When Defendant handed the documents to Nations, "his hand was visibly shaking." (Tr. at 69.)

When Nations looked at the rental agreement for the truck Defendant was driving, he saw that it was rented by Maurice Harris. (Tr. at 70; Gov. Ex. 5; Def. Ex. 1 at 3-4.) Defendant's name was not listed anywhere on the agreement. (Tr. at 70; Gov. Ex. 5.)

Nations asked Defendant to step to the rear of his vehicle while he went back to his patrol unit to check the information provided by Defendant. (Tr. at 70-71.) Nations verified that Defendant's license was suspended and that he had an extensive criminal history. (Tr. at 73.) During this time, Nations observed Defendant visibly shaking, refusing to make eye contact, and exhibiting extremely nervous behavior. (Def. Ex. 1 at 4; Tr. at 105-106.) Based on these observations, and Defendant's questionable trip itinerary, Nations decided to search his vehicle. (Def. Ex. 1 at 4; Tr. at 68-69.) Nations radioed St. Romain to come to the scene as backup. (Tr. at 72.)

### 2. St. Romain's Testimony

St. Romain played no role in conducting the initial traffic stop. Rather, he was contacted by Nations shortly after Nations effectuated a stop and advised that he wanted to search the vehicle. (Tr. at 132.) St. Romain and his K-9 then arrived at the scene soon thereafter. (*Id.*)

Once they arrived, Nations asked Defendant for consent to search his truck. (Tr. at 132-33.) Defendant declined. (Tr. at 133.) Thereafter, St. Romain and the K9 conducted an open-air sniff. (*Id*.) The K9 alerted the officers to the presence of illegal narcotics in Defendant's truck. (Tr. at 133-35.)

Nations then searched Defendant's vehicle and found a green drawstring bag tucked under the rear passenger seat that contained approximately 1.2 kilograms of cocaine. (Tr. at 78-79; Gov. Ex. 7; Def. Ex. 1 at 4.) Nations found an empty five-hour energy drink, an empty cigarette packet, a CD case, a paper bag with fudge, and a receipt from a Baton Rouge Burger King time stamped at 5:21 a.m. on May 6, 2018. (Tr. at 66; Gov. Ex. 4.)

### D. Defendant's Testimony

Defendant gave a different version of events. Defendant maintained that he did not commit any traffic violation. Specifically, he said that he did not strike the fog line and was especially aware of his driving because he saw Nations' patrol car driving behind him. (Doc. 38, Tr. at 172.)

Additionally, he testified that when he drove across the overpass at the Tiger Truck Stop, he saw St. Romain parked on the side of the interstate. (Tr. at 168.) Defendant testified that St. Romain did not enter the roadway and follow him. (Tr. at 169.)

A few miles down the road, Defendant saw a second trooper, later identified as Nations, parked alone in the median of I-10. (Tr. at 169.) Defendant testified that he first saw Nations when he was checking his mirrors to make sure he could return to the right-hand lane after passing another vehicle. (Tr. at 170-71.) Defendant estimates that within 30 seconds of Nations pulling out, Nations activated his emergency lights to stop him. (Tr. at 171.)

### E. Narrative Reports

In this case, DEA TFO Banks, LSP Investigator Toney, Master Trooper St. Romain, and Sergeant Nations all authored a written report describing their involvement in the events leading up to Defendant's arrest. Notably, TFO Banks' report is the only one that mentions the tip he received from a confidential informant. (Gov. Ex. 1.)

Toney's case report does not mention the tip he received from Banks, nor that he relayed that tip to any troopers in the field. (*See* Def. Ex. 2 (stating that Nations conducted a traffic stop on Defendant's vehicle with no mention of the tip); Tr. at 40-41 ("Q. There's nothing about the tip, right? A. Correct."); Tr. at 41 ("Q. And you didn't write a report that says that you took that tip and you made a phone call to a state trooper in the field and relayed that information to the state trooper, right? A. Correct.").) The affidavit in support of a search warrant that Toney authored also fails to mention the tip. (Def. Ex. 3; Tr. at 43.)

Likewise, absent from Nations' and St. Romain's reports are any reference to the tip. (Tr. at 101-02, 146; Def. Ex. 1; Def. Ex. 9-b.) Additionally, none of the body camera footage introduced at the hearing includes mention of the tip. (*See* Gov. Ex. 2b; Def. Ex. 10a, 10b, 11.)

### F. LSP Manual for in-car and body camera use

The LSP policy manual for In-Car and Body Cameras was introduced into evidence at the hearing. (Def. Ex. 8.) LSP's In-Car Camera Systems policy provides: "It is the policy of this Department *that officers equipped with the BWC [Body Worn Camera] and/or in-car camera system shall use the BWC and/or in-car camera system in accordance with the guidelines of this policy in the performance of their official duties.*" (Def. Ex. 8 at 1 (emphasis added).) However, the LSP In-Car Camera policy does not require that all vehicles be equipped with dash cameras.

6

(*Id.*) It only requires that if a vehicle has a dash camera in it, it should be on and operated in accordance with the policy. (*Id.*)

Nations testified that his assigned vehicle was new and did not have a dash camera installed yet. (Tr. at 57.) He explained that his supervisor was aware that his vehicle did not have dash camera and that he did not have another option to drive a vehicle with a dash camera that day. (*Id.*)

LSP Lieutenant Lanny Bergeron's testimony corroborated Nations' testimony. Lt. Bergeron is the Executive Officer over Fleet Operations. (Tr. at 160.) As part of his job, he manages and services all LSP patrol units, including the installation of dash cameras. (Tr. at 160, 163-64.) Bergeron testified that he was not the Fleet Commander at the time of the incident in question, so he could not explain why Nations' and St. Romain's patrol cars did not have dash cameras. (Tr. at 161-62.) However, he did explain he is not aware of any policy that requires dash cameras to be installed in all LSP vehicles. (Tr. at 161, 163, testifying that "many troopers, including myself, … don't have a camera in [their] car.")

Additionally, he testified that dash cameras do not come pre-installed and that it takes time to install them when a new fleet of vehicles comes in. (Tr. at 161, stating that it took him close to 6 or 7 months to install dash cameras in a fleet of 247 patrol units.) "If we have cameras available, we try to outfit all of our units with cameras, but if there's not any cameras, I can't put a camera if I don't have a camera." (Tr. at 161-62.) Therefore, according to Bergeron, it is possible that a trooper can be issued a patrol car that does not have a dash camera system. (Tr. at 163.)

LSP's Body Camera policy provides: "[Body Worn Cameras] shall be worn on the chest or front portion of the duty belt in such a manner to prevent, to the extent possible, obstruction of the camera by the uniform or equipment." (Def. Ex. 8.) Nations explained that he wore his camera on his waist, as is his preference. (Tr. at 83.) St. Romain also testified to this effect. (Tr. at 158.)

## II.    Parties Arguments

### A. Defendant's Memorandum (Doc. 39)

Defendant asserts that the May 6, 2018 traffic stop was in violation of his Fourth Amendment rights because the stop was not justified at its inception. (Doc. 39 at 2.)[2]  More specifically, Defendant argues that there was no reasonable suspicion to effectuate a stop of his vehicle because: (1) the LSP troopers' testimony and written reports disavowed the tip as reasonable suspicion; and (2) Nations did not observe Defendant commit a traffic violation. (*Id*. at 7-9.)

Defendant first attacks the tip, which "cannot be used as reasonable suspicion." (*Id*. at 8.) According to Defendant, since Nations, St. Romain, and Toney all testified that the reason for the stop was a traffic violation—not the tip—the tip is irrelevant for determining reasonable suspicion. (*Id*. at 8-9.) The fact that every written report prepared by the LSP in this case omits any mention of the tip further supports this position. (*Id*. at 9.)

Defendant then argues that the Government failed to carry its burden of proving Defendant committed a traffic violation or that Nations observed that violation. (*Id*.)  In support of this, Defendant principally attacks Nations' credibility:

> [Nations'] written report in the case, like the other LSP reports in this case, are inaccurate and misleading. He was operating without a dash camera and wore his body camera in a fashion where it failed to capture important video and he intentionally muted the audio at many portions. His agency, the LSP, was openly antagonistic to the defense team in this case in response to their routine inquiries about the lack of dash cameras in this case.

(*Id*. at 11.)

---

[2] Defendant notes that: "When investigating agencies provide false or inaccurate documents, as they did in this case, and then refuse to speak to appointed counsel, as they did in this case (*See* Tr. at 162), the entire purpose of the criminal justice system – to seek the truth – is frustrated." (Doc. 39 at 2 n.1.)

Defendant also emphasizes alleged inconsistencies in Nations' testimony. At the hearing, Nations testified that he was parked on the shoulder of I-10 next to St. Romain and that the two of them were observing traffic when he encountered Defendant. (*Id*. at 9-10.) However, Defendant asserts that Nations' testimony is contradicted by: (1) his own written incident report where he claims that he was driving on I-10 when he first encountered Defendant; (2) St. Romain's testimony wherein he stated that he was not with Nations nor was he parked next to him; and (3) Defendant's testimony that Nations was sitting alone in the median, not on the shoulder of the interstate. (*Id*. at 10-11.) Thus, considering the evidence presented at the hearing, Defendant's version of events is more plausible than Nations. (*Id*. at 11.) As such, the Government failed to meet its burden of proving that Nations had reasonable suspicion to stop Defendant's vehicle, and therefore, his motion should be granted. (*Id*. at 12.)

### B. The Government's Opposition (Doc. 40)

The Government responds that Officer Nations had reasonable suspicion to make a traffic stop at the outset. (Doc. 40 at 1.) Specifically, the Government avers that the traffic stop was valid at its inception because: (1) DEA TFO Banks received a reliable, credible tip that Defendant was involved in drug trafficking which was communicated to Nations; and (2) Nations saw Defendant commit a traffic violation.[3]

As to the first, the Government argues that the tip provided to TFO Banks created reasonable suspicion based on the collective knowledge of the law enforcement officers involved in this case. (*Id*. at 1-2.) The Government details that the tip was very specific; from a reliable and

---

[3] In response to Defendant's attack as to the accuracy of documents involved in this case, the Government points out that Defendant "was in possession of the reports of the tip and the execution of the traffic stop . . . well before [Defendant] filed its motion to suppress on September 17, 2020." (Doc. 40 at 6 n.4.) As such, "it is unclear how this could be an afront to 'the entire purpose of the criminal justice system' as Defendant asserts." (*Id*.)

credible source; was communicated to Nations; was not stale; and was corroborated by Nations in the field. (*Id*. at 2-3.)

Regardless, Nations testified that he saw Defendant commit a traffic violation, which provides an independent basis for reasonable suspicion. (*Id.* at 3.)

Further, contrary to Defendant's assertions, "Nations' observation of a traffic violation and his statement that he conducted the traffic stop based on this observation does not render the reasonable suspicion of drug trafficking based on the DEA tip invalid." (*Id.* at 7.)

The Government then addresses Defendant's attack on Nations' credibility, which relies on "nothing more than minor inconsistencies, self-serving testimony by defendant, and actions which were in accordance with LSP policy." (*Id*.)  First, the Government emphasizes that Nations is a credible witness. (*Id*. at 8.) Nations is a twelve-year veteran of LSP, was named 2016 Trooper of the Year for Louisiana, and has conducted thousands of traffic stop. (*Id*. (citing Tr. at 48, 50).) Nations consistently testified that he observed Defendant commit a traffic violation by striking the fog line in violation of La. R.S. 32:79. (*Id*. at 3 (citing Tr. at 59-60).)  And his dash camera and body camera usage on the day in question was in accordance with LSP policy. (*Id.* at 8-9.)

The Government then rejects Defendant's "attempts to tarnish Sgt. Nations' credibility by asserting that Sgt. Nations remembered MT St. Romain being next to him when the defendant's vehicle passed, but MT St. Romain does not recall being there when Sgt. Nations first saw the defendant's vehicle." (*Id.* at 9.)  According to the Government, this is only a minor inconsistency in the testimony of these LSP Troopers. (*Id.*) "The important thing is that their testimony was consistent as to the substantive details of that afternoon." (*Id.*)

Nations' testimony is also consistent with his written report. (*Id.* at 10.)  And the fact that the DEA tip was not included in his report "does not mean there was any nefarious intent to withhold that information." (*Id.*)

Moreover, Defendant has "demonstrated that he is not trustworthy—he lied to Sgt. Nations about his travel plans, he has a significant criminal history, and he was engaged in drug trafficking at the time of the stop." (*Id.* at 10.) According to the Government, the traffic violation he committed is indicative of a person that is distracted or impaired. (*Id.*) The evidence (tip, LPR reader, empty 5-hour energy bottle) demonstrate that Defendant had been traveling a long distance when he was stopped by Nations. (*Id.*)

Lastly, the Government addresses Defendant's criticism of Nations based on LSP's alleged "antagonistic behavior." (*Id.* at 11.)

> The behavior deemed "antagonistic" appears to be LSP not providing defense counsel with what he wanted, that is an LSP policy that required all LSP vehicles to have dash cameras. As there is no such policy, any response would have been deemed antagonistic by the defense. LSP's In-Camera and Body Worn Camera policy was provided to the defense in early September of 2020. Nowhere in the policy manual does it require LSP vehicles to have a dash camera. (Def. Exh. 8). Further, three officers testified to this during the hearing. The fact that LSP did not provide what did not exist is hardly "antagonistic."

(*Id.*)[4]

### C.  Defendant's Reply (Doc. 41)

The "collective knowledge" doctrine does not apply in this case because Nations was not informed that TFO Banks' informant was reliable; Nations did not know the tip came from Banks.

---

[4] The Government also notes that "LT Bergeron's interaction with defense investigators may not have been warm, but it certainly does not rise to the level of antagonistic. He did appear in accordance with his subpoena and testified that he was not aware of any LSP policy requiring dash cameras in all LSP vehicles." (Doc. 40 at 11-12.)  Regardless, the Court should not fault Nations for Bergeron's behavior. (*Id*. at 12)

(Doc. 41 at 1-2.)  Additionally, an objective officer in Nations' shoes would not find reasonable suspicion based upon a tip relayed from another agency. (*Id.* at 4.)

Defendant then makes a broadside attack on the credibility of all LSP officers. (*Id.* at 4-5.) "The government believes that the testimony of an officer should always be believed over that of the accused, despite the numerous recent examples of law enforcement lies and cover-ups from the Louisiana State Police and from law enforcement witnesses who have testified in this district. At this very moment the truthfulness of troopers and their supervisors within the Louisiana State Police is under scrutiny throughout the state…." (*Id.* at 4.)

Defendant then contends that of the two witnesses to the alleged traffic stop in this case—Nations and Defendant—his testimony is more credible. (*Id.* at 5-6.) According to Defendant, the fact that he chose to waive his right to remain silent and take the stand bolsters his credibility. (*Id.* at 5.)  Defendant reiterates that he was calm and articulate on the stand; that he did not waiver in his recollection of the traffic stop; that he consistently denied striking the fog line; and that he made incriminating statements—he admitted to using cocaine, the narcotic found in his vehicle and with which he is currently charged—all of which strengthen his version of events. (*Id.* at 5-6.)

In contrast, Nations' version of events is inconsistent and contradicted by other evidence and testimony. (*Id.* at 5.) Thus, Defendant urges the Court to credit his own testimony over that of Nations' and grant his motion to suppress. (*Id.* at 6.)

## III.    Discussion

Preliminarily, the Court notes that Defendant raised numerous suppression issues in his original memorandum. (Doc. 19-1.)  However, in his post-hearing briefing, Defendant expressly states that he focuses his attack only "on the inadequate basis to conduct the traffic stop on his vehicle." (Doc. 39 at 2.)

Thus, as the Government correctly notes, Defendant has conceded "that any extension of the stop and the search of the vehicle were constitutional." (Doc. 40 at 3 (citing Doc. 39 at 2); *Id.* at 6 n.4 ("[D]efendant's brief appears to concede all issues other than reasonable suspicion for the stop, asserting that the other issues were raised based on 'inaccurate' information provided.").) As such, the Court only addresses whether the traffic stop was justified at its inception under the first *Terry* prong.

### A. Applicable Law

#### 1. General Principles

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (quoting U.S. Const. amend. IV). "The essential purpose of the Fourth Amendment is to impose a standard of 'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *Id.* (citing *Delaware v. Prouse,* 440 U.S. 648, 653–654, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). Accordingly, "the Supreme Court has determined that warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir. 1993) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)).

"While in general, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the government." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). The Fifth Circuit has stated that one situation in which the burden shifts to the Government is when a defendant shows that he was

subject to search without a warrant. *Id.* (citing *United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir.), *cert. denied* 431 U.S. 932, 97 S. Ct. 2640, 53 L. Ed. 2d 249 (1977)). Consequently, because it is undisputed that Defendant was subject to a warrantless search, the Government bears the burden of proving the legality of the stop and the warrantless search by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S. Ct. 988, 996, 39 L. Ed. 2d 242 (1974).

### 2. Reasonable Suspicion under *Terry*

Traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse,* 440 U.S. 648, 653, 9 S. Ct. 1391, 1396, 59 L. Ed. 2d 660 (1979); *United States v. Jones,* 234 F.3d 234, 239 (5th Cir. 2000). However, because a routine traffic stop tends to be "a relatively brief encounter," it is considered "more analogous to a so-called *'Terry* stop' ... than to a formal arrest." *Knowles v. Iowa,* 525 U.S. 113, 117, 119 S. Ct. 484, 488, 142 L. Ed. 2d 492 (1998) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984) (citing *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968))). *See also Arizona v. Johnson,* 555 U.S. 323, 330, 129 S. Ct. 781, 786, 172 L. Ed. 2d 694 (2009).

Thus, courts must analyze the legality of a traffic stop under the two-part test articulated in *Terry,* which asks "whether the officer's action was: (1) justified at its inception; and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20, 88 S. Ct. 1868; *see also United States v. Berry*, 664 F. App'x 413, 418 (5th Cir. 2016) (per curiam).

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez-Moreno*, 420 F.3d at 430 (citing *United States*

*v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)).  "To pass muster, [the officer's] suspicion must have been based on specific and articulable facts and not mere hunches." *United States v. Martinez*, 808 F.2d 1050, 1054 (5th Cir. 1987) (citing *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 694–95, 66 L. Ed. 2d 621 (1981); *Terry*, 392 U.S. at 21, 88 S. Ct. at 1879). Additionally, the Court "must gauge those facts not individually, but in their totality and as seen and interpreted by officers of [Nations'] experience." *Id.* (citations omitted).

### B.  Analysis

Turning to the facts of the instant case, the Court must resolve the central question: did Nations see Defendant commit a traffic violation?  Having listened to Nations' testimony, observed him in open court, and reviewed the video and written transcript and narrative, the Court finds that he did. As such, the Court does not address whether the tip provided an independent basis for reasonable suspicion.

The Court recognizes that both Nations and Defendant have some bias.  Nations has an interest in his investigation, and, as the Government contends, Defendant has an interest in protecting himself. However, the Court finds that Nations' testimony was more believable than Defendant's.

Nations' testimony was thoroughly detailed, consistent, and objectively believable as discussed in more detail below. Nations testified that he was twelve-year veteran of LSP, had been named 2016 Trooper of the Year for Louisiana, and has conducted thousands of traffic stops. (Doc. 38, Tr. at 48, 50.) On a motion to suppress, "credibility determinations are for the district court." *United States v. Santiago*, 410 F.3d 193, 198 (5th Cir. 2005).  Here, the Court found Nations' testimony at the hearing to be objectively more credible than Defendant's, and thus accepts his version of the events in question.

Specifically, Nations testified that, on the day in question, he and St. Romain were patrolling along I-10 in West Baton Rouge Parish. (Doc. 38, Tr. at 55-56.) While on criminal patrol, Nations noticed a black truck strike the fog line several times, which is a violation of La. R.S. 32:79. (Tr. at 59, 60.) After observing this violation, Nations activated his lights and effectuated a stop on the truck that Defendant was driving. (Tr. at 59.) Nations stated multiple times at the hearing that he observed the vehicle strike the fog line prior to initiating his lights and stopping the vehicle. (Tr. at 59, 60, 89, 90.) The Court believes him.

This testimony is consistent with his incident report, which states:

On May 6, 2018 at approximately 1646 hours, I was traveling eastbound on I-10 in West Baton Rouge Parish. While patrolling eastbound I observed a black Chevrolet pickup (LA Plate # C576461) strike the white fog line to the right side of the road on 3 separate occasions by a half of a tire[']s width each time. After observing the traffic violation, I activated my blue emergency lights[,] and the vehicle came to a stop on I-10 eastbound MP 148 in West Baton Rouge Parish.

(Def. Ex. 1 at 3.)

### a. Inconsistencies in Nations' Testimony

Defendant makes much out of alleged inconsistencies in Nations' testimony. At the hearing, Nations testified that he was sitting in his unit on the shoulder of I-10 in the grass near mile marker 145 facing I-10 eastbound and that St. Romain was sitting in his unit at the same location when they saw Defendant's vehicle. (Tr. at 87, 88 ("Q. So y'all are sitting together, two vehicles on the shoulder, when Mr. Zeno passes in the black truck? A. That's how we monitor traffic, yes, sir.").)

Defendant notes that this testimony directly conflicts with that of St. Romain's, who said that he was not with Nations when Nations first saw Defendant's vehicle. (Tr. at 138 ("Q. So y'all weren't parked next to each other or nothing like that, right? A. No, sir.").) St. Romain testified that he was somewhere else on I-10 when Nations radioed him and asked him to assist with the

traffic stop. (Tr. at 132, 153; *see also* Def. Ex. 11.) Further, Defendant testified that Nations was sitting alone in a clearing in the median, not on the shoulder. (Tr. 169.)

However, St. Romain later stated: "I can't say exactly where I was, but I was not behind [Nations] when he made the stop on the vehicle." (Tr. at 147 ("Q. Were you with him when he pulled out to follow the vehicle? A. I don't recall. I can't say exactly where I was. I was on I-10 in West Baton Rouge Parish.").) And, as the Government points out, any inconsistency between Nations' and St. Romain's testimony is extremely minor. (Doc. 40 at 7, 9.) It is not substantive, and their testimony was consistent as to all the substantive details of that afternoon. Further, as Defendant notes, there are only two witnesses to the alleged traffic violation: Defendant and Nations. St. Romain did not see the violation; he arrived at the scene later.

Defendant also attacks Nations' testimony on the grounds that it conflicts with his written incident report, wherein stated he was "travelling eastbound on I-10" when he "observed a black Chevrolet pickup (LA Plate# C576461) strike the white fog line to the right side of the road on 3 separate occasions…" (Def. Ex. 1 at 3; Tr. at 102-03.) But Nations' report only explains when and where he was at the time he observed Defendant commit a traffic violation. (Def. Ex. 1 at 3.) The testimony he gave at the hearing is not in conflict with this. Again, he testified that he was sitting in his unit on the shoulder of I-10 when he first saw Defendant's vehicle. (Tr. at 87, 88.) He then pulled into traffic on I-10 eastbound and followed Defendant for a few miles and observed the traffic violation. (Tr. at 58, 59, 60.)

### b.  Attack on Nations' Written Report

Defendant also points out that Nations did not include in his report on the stop any hint that the stop was made on information provided by the DEA.  While it seems odd that Nations would not include such information in his report, his decision not to do so does not destroy his credibility

about the traffic stop. Nations testified regarding his reasoning for not including the tip in his report:

> We do not include tips in our reports . . . Because a lot of them don't check out. Even though this one did, I don't know where this tip came from ultimately. I don't know what kind of cases are being worked surrounding this tip, and if they have a confidential informant or somebody that's working, I'm not going to put any of that information in the report for his safety. That's why we develop our own probable cause to stop that vehicle.

(Tr. 80.)

The Court disagrees with Defendant and his counsel that key information was withheld from them. In this case, the information was not withheld; it was produced in other discovery. (*See* Doc. 40 at 6 n.4, explaining that TFO Bank's DEA intelligence report as well as Nations' and Toney's LSP reports were provided to Defendant on August 10, 2020, before Defendant filed its motion to suppress on September 17, 2020.) It just was not in Nations' report. *United States v. Stein*, 2016 WL 4534914, at *4 (W.D. La. July 13, 2016), *report and recommendation adopted*, 2016 WL 4540866 (W.D. La. Aug. 29, 2016) (finding that a trooper's decision not to include a tip in his report, when he testified as to his reasoning, did not hamper his credibility); *United States v. Adams*, 2010 WL 3504072, at *14 (E.D. Mich. Mar. 10, 2010), *report and recommendation adopted*, 2010 WL 3504065 (E.D. Mich. Sept. 2, 2010) ("Defendant appears to argue that the troopers are not credible because the police report relating to this incident omitted the DEA's request to stop the vehicle, but that information was omitted at the request of the DEA so as not to compromise the ongoing investigation and, therefore, the police report does not lessen the troopers' credibility."); *United States v. Mosquera-Castro*, No. 17-13, 2018 WL 3067738, at *7 (M.D. La. June 21, 2018) (deGravelles, J.) ("The Court similarly finds unremarkable the omission of the drug trafficking investigation from Hebert's report. Defendant suggests that this shows Hebert's 'willingness to engage in deception,' but there has been no credible suggestion that Hebert has

attempted to conceal the existence of the investigation from anyone other than the subjects of the investigation such that it might affect his credibility before this Court.").

### c.  Lack of Dash Cam or Body Cam Footage

Lastly, Defendant vehemently attacks Nations' use of his body camera on the day in question. Specifically, Defendant claims that Nations wore his body camera on his belt so that "it failed to capture important video and he intentionally muted the audio at many portions." (Doc. 39 at 11, 1-2.) He also attacks the lack of a dash camera in Nations' patrol car. (*Id*.) However, as the Government explained, Nations' actions while conducting a traffic stop and search of Defendant's vehicle were in accordance with LSP policy-specifically the camera policy. (Doc. 40 at 8-9.)

LSP's body camera policy provides: "[Body Worn Cameras] shall be worn on the chest or front portion of the duty belt in such a manner to prevent, to the extent possible, obstruction of the camera by the uniform or equipment." (Def. Ex. 8.) On the day in question, Nations testified that he was wearing his body camera positioned on his LSP-issued belt in accordance with the above policy. (Doc. 38, Tr. at 82-83.) Nations explained that he preferred to wear the body camera on his belt and has done so since he was issued a body camera approximately 3-4 years ago. (Tr. at 84.) Further, Nations testified that he did not wear his body camera in this position to intentionally obstruct the recording. (Tr. at 83, 158, St. Romain also testified that he preferred to wear his body camera on his waist.)

LSP's In-Car Camera Systems policy provides: "It is the policy of this Department *that officers equipped with the BWC and/or in-car camera system* shall use the BWC and/or in-car camera system in accordance with the guidelines of this policy in the performance of their official duties." (Def. Ex. 8 (emphasis added).) "*Officers equipped with the BWC or in-car camera system recording equipment* shall record all traffic stops, foot pursuits, arrests and/or incidents." (*Id*.)

19

The LSP In-Car Camera Policy does not require all vehicles be equipped with dash cameras; rather it only requires that if a vehicle is equipped with a dash camera, it should be on and operated in accordance with the policy. (*Id.*; *see also*, Tr. at 163, Lt. Bergeron, the Executive Officer over Fleet Operations, explaining he is not aware of any policy that requires dash cameras to be in all LSP vehicles; 149, St. Romain, explaining same.)

Nations testified that his assigned vehicle was new and did not have a dash camera installed yet. (Tr. at 56-57.) He explained that his supervisor was aware that his vehicle did not have dash camera and that he did not have another option with a dash camera to drive that day. (*Id.* at 57.) Therefore, contrary to Defendant's assertions, Nations did not violate LSP policy. And even if he had, a violation of the LSP internal policy does not necessarily equate with a Fourth Amendment violation warranting suppression.

In sum, the first *Terry* prong is met in this case. Nations testified that the vehicle Defendant was driving struck the fog line. The Court finds Nations' testimony to be credible. The Louisiana Supreme Court has held that striking the fog line is improper lane usage in violation of La. R.S. 32:79. *State v. Waters*, 780 So.2d 1053 (La. 2001); *United States v. Hernandez*, 744 Fed. Appx. 873, 874 (5th Cir. 2018) ("Because Hernandez's vehicle briefly touched the fog line, the state trooper had probable cause to believe a traffic violation occurred, and this reasonable suspicion justified the traffic stop at its inception."). *See also United States v. Bell-Brayboy*, 2017 WL 5078400 (W.D. La. 2017).

Further, the stop was lawful even if Nations' subjective reason for the stop was to look for evidence of other crimes—particularly that of drug trafficking. "*Whren* allows officers to justify a stop by the occurrence of a traffic violation even though this is not the real reason for the stop." *United States v. Cole*, 444 F.3d 688, 689 (5th Cir. 2006) (citing *Whren v. United States*, 517 U.S.

806, 811–13, 116 S. Ct. 1769, 135 L. Ed. 2d 89; *United States v. Sanchez–Pena,* 336 F.3d 431, 437 (5th Cir. 2003) (holding that "the constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved. An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses.") (citing *Whren*); *Goodwin v. Johnson,* 132 F.3d 162, 173 (5th Cir. 1997) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment ....") (citing *Whren*).  The legal justification for the stop must simply be "objectively grounded." *Id*. The evidence establishes objective grounds for this stop.

For the foregoing reasons, the Government has shown by a preponderance of the evidence that Nations had reasonable suspicion to believe Defendant committed a traffic violation, satisfying the first *Terry* prong.  As a result, the Court does not address whether the tip provided an independent basis for reasonable suspicion.

## IV.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Defendant's Motion to Suppress* (Doc. 19) filed by Defendant Andre Zeno is **DENIED**.

Signed in Baton Rouge, Louisiana, on July 28, 2021.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**